**Frances GAY, Plaintiff,**

v.

**EXTENDED FAMILY CONCEPTS, Defendants.**

**No. 5:99–CV–2498.**

United States District Court, N.D. Ohio, Eastern Division.

June 27, 2000.

Concepts, Inc., dba Heather Ridge Commons, Defendants.

## OPINION AND ORDER

GWIN, District Judge.

On April 3, 2000, Defendant Extended Family Concepts filed for summary judgment in this action involving compensation for care providers at a shared living facility. [Doc. 22]. One week later, Defendant amended this motion. [Doc. 24].

With this motion, defendant argues that there is no genuine issue for trial because the "companion exemption" stops Plaintiff Frances Gay's claim under the Fair Labor Standards Act ("FLSA" or "the Act"), 29 U.S.C. § 201 *et seq.* Defendant also says the parties had an agreement to exempt sleep time from compensable wages. Finally, Defendant Extended Family Concepts contends that any violations occurring outside the law's two-year statute of limitations must be barred.

Upon review of the motion and relevant record evidence, the Court finds that Plaintiff Gay does not fall into the "companionship exemption." The Court also finds a genuine issue regarding the parties' agreement about sleep time. The Court therefore denies defendant's motion on these issues.

The Court finds no genuine issue regarding the statute of limitations. The Court finds that a two-year statute of limitations applies. The Court therefore grants defendant's motion on this issue.

## I. FACTUAL BACKGROUND

From August 1996 to October 1998, Plaintiff Frances Gay was employed as a "homemaker" at defendant's shared living facility in North Canton, Ohio. As a homemaker, Plaintiff Gay helped senior citizens who needed assistance in living otherwise independent lives.

Plaintiff Gay worked seven twenty-four hour shifts at defendant's facility every

David B. Wirsching, Canton, OH, for Frances D. Gay, Plaintiff.

Robert J. Tscholl, Schulman & Associates, Canton, OH, for Extended Family

two weeks. In one of the two weeks, Gay worked three twenty-four hour shifts. In the second of the two weeks, Plaintiff Gay worked four twenty-four hour shifts. Under this schedule, Gay worked a total of 168 hours over the two-week period.

Homemakers such as Gay spend most of their work time taking care of the facility's residents—cooking, feeding the senior citizen, and doing laundry. Homemakers also perform general household chores to maintain the premises. For eight hours of each twenty-four hour shift, homemakers sleep in a separate room on the premises.

Defendant Extended Family Concepts paid homemakers at a daily rate. Before June 1998, defendant broke down the daily rate into an hourly wage for the 16 working hours and a rate of $1.00 an hour for the eight sleeping hours. If a homemaker's sleep was interrupted, employees were entitled to a much higher hourly wage for documented interruption time. Defendant believed it did not have to pay overtime because the homemakers provided "companionship services" to the residents. *See* 29 U.S.C. § 213(a)(15).

On October 18, 1999, Plaintiff Gay filed suit against Defendant Extended Family Concepts. Gay also makes claim against Gloria Prose, the owner of Defendant Extended Family Concepts and operator of the North Canton facility.

In the Complaint, Plaintiff Gay alleges that defendant failed to pay her overtime under the Fair Labor Standards Act. Gay says all hours she worked above 40 hours each week, including sleep time, are compensable as overtime. *See* 29 U.S.C. § 207.

On April 3, 2000, Defendant Extended Family filed the instant motion for summary judgment. Defendant says it is exempt from the Act's requirements because Plaintiff Gay provides companionship services to the facility's residents. Alternatively, defendant contends it had an agreement with Plaintiff Gay that it would not pay her for sleeping hours. If so, those hours would not be compensable. *See* 29 C.F.R. 785.22. Finally, defendant says any violations of the Act occurring before October 19, 1997, are barred by the applicable statute of limitations.

## II. LEGAL STANDARD

In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987); *SEC v. Blavin*, 760 F.2d 706, 710 (6th Cir.1985). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *See 60 Ivy Street Corp.*, 822 F.2d at 1435.

Essentially factual disputes about matters essential to adjudication preclude the Court from granting summary judgment. *See id.* But not every factual dispute between the parties will prevent summary judgment. Rather, the disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The factual dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the non-moving party. *See id.* at 248, 106 S.Ct. 2505. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *See 60 Ivy Street*, 822 F.2d at 1435 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Thus, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *60 Ivy Street*, 822 F.2d at 1436 (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505).

The Court now reviews defendant's motion with these standards in mind.

## III.  DISCUSSION

### A.  Companionship Services Exemption

The Fair Labor Standards Act mandates the payment of minimum wage and overtime. *See* 29 U.S.C. § 206 and § 207(a). Defendant Extended Family Concepts says that Plaintiff Gay is exempted from the Act's protections because she provided "companionship services" to facility's residents. The Court disagrees.

■ The Act expressly excludes from coverage "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15). The employer bears the burden of establishing an exemption under the FLSA. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

The Fair Labor Standards Act should be construed broadly in light of its remedial and humanitarian purpose. *See Salyer v. Ohio Bureau of Workers' Compensation*, 83 F.3d 784, 786 (6th Cir.1996). Accordingly, exemptions under it "are to be narrowly construed against the employers seeking to assert them and their application is limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).[1]

Under the plain terms of the statute, the Court must find that Plaintiff Gay is engaged in "domestic service employment" before it can find her exempt for performing "companionship services." *See, e.g., McCune v. Oregon Senior Services Div.*, 894 F.2d 1107, 1109 (9th Cir.1990) ("Congress clearly recognized that companions would be an exempt sub-category of domestic service workers."); *Linn v. Developmental Services of Tulsa, Inc.*, 891 F.Supp. 574, 580 (D.Okla.1995) ("[I]n order for the exemption to apply ... [workers] must qualify as 'domestic service employees.' "); *Lott v. Rigby*, 746 F.Supp. 1084, 1086 (N.D.Ga.1990) ("The 'companionship services' exemption to FLSA applies only to 'domestic service employment.' ").

Plaintiff Gay contends the exemption does not apply to her because she was not engaged in "domestic service." The regulations define the term in the following manner:

As used in section 13(a)(15) [i.e., 29 U.S.C. § 213(a)(15) ] of the Act, the term "domestic service employment" refers to *services of a household nature*

---

1.  Departing from a narrow construction of the Act's exemptions would belie the purpose of the Act:

> The Fair Labor Standards Act was designed "to extend the frontiers of social progress" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legis-

lation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

*performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed.* The term includes employees such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use. It also includes babysitters employed on other than a casual basis. This listing is illustrative and not exhaustive.

29 C.F.R. § 552.3 (emphasis added).

More specifically, Plaintiff Gay contends she did not engaged in domestic service because she did not work in a private home. The regulation is "unambiguous and clearly indicates that being employed in a private home is an integral part of the definition" of a domestic service employee. *Lott*, 746 F.Supp. at 1086. The Sixth Circuit has agreed with the *Lott* court's conclusion. *See Salyer*, 83 F.3d at 789 ("[W]e find persuasive the rationale of the court in *Lott* . . . which drew on the exemption's legislative history to hold that 'domestic service employment' simply means being 'employed in a private home.' ").

The legislative history explicitly supports this conclusion:

> The term "domestic service" employees is not defined in the Act. However, the generally accepted meaning of domestic service relates to services of a household nature performed by an employee in or about a private home of the person by whom he or she is employed. The do-

mestic service must be performed in a private home which is a fixed abode of the individual or family.

*Lott*, 746 F.Supp. at 1086 (quoting H.R.Rep. No. 913, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 2811, 2845).[2] A court "must closely examine the living arrangements to determine whether residences where Plaintiff works should be characterized as 'private homes.' " *See Linn*, 891 F.Supp. at 579.

The Sixth Circuit has not had the opportunity to address what factors the Court must consider in determining whether a facility is a private home. *See, e.g., Salyer*, 83 F.3d at 789 (no discussion necessary because plaintiff was caring for husband in the family home); *Hengesback v. Green River Regional Mental Health/Mental Retardation Board*, 985 F.2d 560 (TABLE), 1993 WL 20126 (6th Cir. Jan.28, 1993) (no discussion); *see also Toth v. Green River Regional Mental Health/Mental Retardation Board*, 753 F.Supp. 216 (W.D.Ky. 1989) (containing no discussion of "private home" in finding that plaintiffs fell into companionship exemption). However, several courts around the country have, and their respective analyses are instructive.

One court found that the residence at issue was not a private home because more than three people lived there and because the defendant company acquired the residence, maintained keys to the building, made decisions about who would live there, and grouped unrelated persons together. *See Linn v. Developmental Servs. of Tul-*

---

2. As the *Lott* court noted, a federal Wage and Hour Administrator indicated a similar interpretation of the Act:

> With regard to its legislative history, the Congress intended that domestic service be considered as relating to services of a household nature performed by an employee in or about the private home of the person by whom he or she is employed. Services performed outside of a private home would not be within the term "domestic service." Accordingly, the exemption would not apply to employees providing care to institutionalized persons . . .

even though they are in a residential home setting.

*Lott*, 746 F.Supp. at 1086 (quoting Wage and Hour Opinion WH–368, 91 W.H.M. 1031 (Nov 25, 1975)).

Wage and Hour Administrators' interpretations of FLSA, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

sa, Inc., 891 F.Supp. 574, 579 (N.D.Okla. 1995). Other courts consider similar factors. *See, e.g., Terwilliger v. Home of Hope,* 21 F.Supp.2d 1294, 1299–1300 (N.D.Okla.1998) (finding there was a "private home" because company providing services had no ownership interest in the home, residents chose whether to have housemates and who those persons would be, one-third of the residences were occupied by a single client, and employees had access to keys only for emergencies).

One district court described four factors important to determining whether a "private home" is involved. Although none of these factors alone is dispositive, the district court recommended review of: (1) the residence's source of funding; (2) access to the facility by the general public; (3) whether the facility is organized for profit or is a nonprofit organization; and (4) the size of the organization. *See Bowler v. Deseret Village Assoc., Inc.,* 922 P.2d 8, 13–14 (Utah 1996) (footnotes omitted).

■ Taking into consideration the approaches taken by other courts, the Court finds that the residences provided by Defendant Extended Family Concepts are not private homes.

First, Extended Family Concepts is organized as a for-profit corporation.

Second, although there are only eight buildings in defendant's complex, the community is designed to accommodate 96 people, or twelve residents to each building. As Defendant Prose explained in her deposition, the residences sometimes had more than twelve occupants because a couple might share space. Each residence is broken into four, three-bedroom suites, each with its own kitchenette and private bathroom. But the homemaker prepares three meals each day in the communal kitchen and the residents eat in the com-

munal dining area. There is also a communal sunroom. The number of residents and their daily living habits weigh against finding that a given building is a "private home" for those residents.[3]

Third, the residents do not maintain the property. As legislative history indicates, "[a] separate and distinct dwelling *maintained by the individual or family* in an apartment, house, or hotel may constitute a private home." *Lott,* 746 F.Supp. at 1087 (quoting H.R.Rep. No. 913, 93d Cong., 2d Sess., *reprinted in* U.S.Code Cong. & Admin. News 2811, 2842–43). Maintenance of the facility is one factor that indicates control of a private home. *See id.* (finding no private home even where clients participated in upkeep as a means of learning home management skills; maintenance was not the responsibility of the clients); *Linn,* 891 F.Supp. at 579 (finding no private home in part because "[a]lthough the clients participate in the upkeep of the home, the Defendant is ultimately responsible for maintaining the residence").

In this case, Defendant Extended Family Concepts employs maintenance people to care for the property. Homemakers like Plaintiff Gay are expected to sweep or otherwise clear the porches or sidewalks in front of their building if maintenance employees fail to clean it first. No evidence before the Court shows that residents maintain the premises.

Fourth, it does not appear that the residents have complete, or even primary, control over their residence. The residence in which Plaintiff Gay worked was subject to tours by prospective residents. Defendant Prose explained that these tours occurred when a potential resident called and asked

---

**3.** As the *Lott* court noted, even if a location is a client's sole residence, that does not mean the facility is a private home:

> ... if the defendant is correct, every publicly funded institution would be a "private home" because it often is the sole residence

of clients while they are present at the institution. The distinction between "institution" and "private home" would thus be eliminated.

*Lott,* 746 F.Supp. at 1087.

for a tour.[4] Homemakers like Plaintiff Gay were expected, as part of their regular duties, to act as hostess during these tours and provide snacks to visitors. There is no evidence that any of the facility's residents could refuse entry to anyone.

Thus, even if Defendants Extended Family Concepts and Gloria Prose were successful in providing a "family-like" or "home-like" environment, the Court cannot find that the residences are private homes as a matter of law. Therefore, the Court finds that Plaintiff Gay was not engaged in domestic service employment for purposes of 29 U.S.C. § 213(a)(15). Consequently, Plaintiff Gay is not exempted from FLSA's protections under the companionship services exemption. Accordingly, the Court denies defendant's motion for summary judgment on this issue.

Because the Court finds that Plaintiff Gay was not engaged in domestic service employment, the Court need not address Defendant Extended Family Concept's argument that she provides companionship services.

### B. Sleep Time Exemption

Defendant Extended Family Concepts argues that Plaintiff Gay's sleeping time should not be counted as work hours. The Court finds a genuine issue exists and denies defendant's motion.

Homemakers at defendant's facility worked seven twenty-four hour shifts during a two-week pay period. Eight hours of each shift was designated as sleep time. Thus, homemakers worked 168 hours every two weeks, with 112 hours being work time and 56 hours being sleep time.

The Fair Labor Standards Act mandates that employees be paid overtime for hours worked beyond 40 hours per week. 29 U.S.C. § 207(a). Defendant Extended Family Concepts did not pay Plaintiff Gay overtime because it believed she was exempt under the companionship exemption. As the Court has explained, plaintiff is not exempt under that section of the Act. Therefore, unless another exemption applies, Plaintiff Gay would be entitled to overtime for hours worked above 40 hours per week.

Plaintiff Gay claims that her sleeping time should also be included among the hours she worked. Defendant Extended Family Concepts argues she is not entitled to pay for those hours because she agreed her sleep hours were exempt from pay.

An employer and its employees may agree to exempt sleep time from paid work time if "adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep." 29 C.F.R. § 785.23. In this case, each residential building had a private bedroom in which homemakers slept, comprising "adequate facilities" under the regulations.

Interrupted sleep must be counted as hours worked. *See* 29 C.F.R. 785.22(b). If the worker cannot get at least five hours of sleep during the sleep period, the worker is entitled to pay for the entire sleep

---

**4.** In her deposition, Defendant Prose explained what triggered a tour:

Q: What prompted a tour?
A: Someone would call in and want to tour the facility.
Prose Dep. at 40, ll.7–9.

Jennifer Gorin, Housing Manager and Director of Human Resources at the complex, gave similar testimony:

Q: Okay. For this home number one where Mrs. Gay was, that was kind of your premier home; is that right?
A: It's the first home on the hill. Most people stop there, yes.

Q: Did she give guided tours of that facility?
A: Yes. At that time, yes.
　　*　　*　　*　　*　　*　　*
Q: Okay. Was it frequent that she did that?
A: I would not say so, no.
Q: What would be the frequency of the number of escorted visits she was to have?
A: It's hard to say. It would depend on the time of year.
Q: Was it one a month, two a month?
A: I'd say one maybe two, certainly no more than that.
Gorin Dep. at 59 ll. 12—60 ll. 10.

period.[5] *Id.* Plaintiff Gay was required to report such interruptions. She often failed to do so.

■ Thus, the remaining issue for the Court's consideration is whether there was an agreement between the parties to exempt sleep time. As the following analysis indicates, the Court finds that material factual disputes exist regarding whether the parties agreed that no compensation would be paid for sleep time.

When Plaintiff Gay began working for Extended Family Concepts in August 1996, defendant paid her $100 per 24-hour shift. For ease of understanding, defendant explained the salary by breaking it down into segments: $5.75 an hour for 16 waking hours, or $92.00, and $1.00 an hour for 8 sleeping hours, or $8.

In August 1997, defendant raised the daily salary to $105 per 24-hour shift. This rate broke down to $6.06 for 16 working hours and $1.00 for 8 sleeping hours.

In June 1998, Extended Family Concepts altered its method of calculating pay. The daily rate of $105 remained the same. But defendant raised the hourly rate to $6.56 for 16 working hours and eliminated sleep pay. Thus, homemakers did not lose money under the new policy, but the treatment of sleep time was altered.

Defendant says its agreement with the plaintiff was to pay a daily rate only. Plaintiff Gay disputes this assertion.

From August 1996 to June 1998, although defendant paid homemakers by shift, the company broke down its payments into hourly wages. Defendant Prose testified as follows:

Q: Okay. But the policy was the rate for sleep time was included in her total rate?

A: Repeat that question.

Q: The rate of pay for sleep time was included in her total pay rate?

A: From 1996 to 1998, that is correct. From 98 on [i.e., after adopting the policy eliminating sleep pay] we had a daily rate, period.

Prose Dep. at 31, ll. 15–24.

Jennifer Gorin, defendant's Housing Manager, testified similarly:

Q: What did you tell [Plaintiff Gay]?

A: When Diane was hired I explained to her the way the shift worked .... That at the time she was hired the company had included into their daily rate, but broken it down so it was more understandable to them, that they were paid basically a dollar an hour for sleeping, then the rest of the money was applied to the hours that they were awake, and they were provided eight hours of sleep.

\* \* \* \* \* \*

Q: Did you tell her that she was paid a dollar an hour for sleep time at that time?

A: At that time, I believe I did to explain the breakdown of the daily rate.

Gorin Dep. at p. 19, l. 19 to p. 20, l. 25.

Defendant Extended Family Concepts maintains that it has always paid its homemakers a shift-based rate, despite sometimes explaining the rate to homemakers as a per-hour wage.

In June 1998, Defendant Extended Family Concepts changed its policy to eliminate sleep time from daily pay. The daily rate remained the same, but sleep time was specifically excluded from compensable time.[6] In other words, the pay

---

**5.** Whenever a homemaker worked beyond the 24-hour shift, defendant paid her overtime. Defendant thought—incorrectly, as the Court has explained—homemakers were exempt from overtime under the companionship exemption. Thus, defendant viewed any overtime pay as strictly voluntary on its part. In addition, if a homemaker's sleep was interrupted, defendant paid her at a separate hourly wage for the time the homemaker reported as being interrupted.

**6.** Nothing in the new policy altered how homemakers would be paid for interruptions during their sleep hours.

did not change, but defendant's understanding of the hourly breakdown did.

The record is unclear regarding when and how employees were notified about the change in policy. Although defendant has provided a copy of the June 1998 pay scale, Plaintiff Gay maintains she never learned about it.

The Act provides an affirmative defense to an employer who "pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the Department of Labor] ... or any administrative practice or enforcement policy of such agency ...." 29 U.S.C. 259. Congress enacted this section after finding that an earlier version of the Act had been "interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation." 29 U.S.C. § 251(a). Therefore, as the Eight Circuit Court of Appeals has noted, "the deference to employment agreements mandated by the Supreme Court in *Skidmore* [*v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ] is particularly appropriate in the context of the § 259 good faith defense." *Bouchard v. Regional Governing Bd. Of Region V Mental Retardation Services*, 939 F.2d 1323, 1328 (8th Cir.1991).

The parties' agreement is central to resolution of the sleep time issue. The record here is unclear about what the parties understood their agreement to be. Therefore, there is a genuine issue for trial.

Accordingly, the Court denies defendant's motion regarding sleep time.

### C. Statute of Limitations

Defendant Extended Family Concepts contends that the Act's two-year statute of limitations applies to this action. Plaintiff Gay argues that defendant's violation was willful and, therefore, that a three-year statute of limitations applies.

Generally, a party must bring her action under the statute within two years of accrual.[7] *See* 29 U.S.C. 255(a). However, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 259.

A "willful" violation of the Act occurs when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). "Willful" refers to conduct that is voluntary, deliberate, intentional, and not merely negligent. *See id.* at 133, 134–35, 108 S.Ct. 1677.

■ Plaintiff Gay has asserted, and defendant has argued, that she spoke with Defendant Prose about Extended Family Concepts' wage policy in June 1998. Gay says the defendants failed to review pay policies thereafter. Even if this allegation is true, it is not evidence that the defendant deliberately and intentionally violated the Act.[8]

The Court finds that the two-year statute of limitations applies. Therefore, all violations before October 19, 1997 are

---

7. The statute offers an employer a good faith defense if it relies on certain Department of Labor regulations, rulings, and interpretations in forming its wage policy. See 29 U.S.C. 259. Defendant Extended Family Concepts has not shown any evidence that it relied in good faith on such guidance from the agency.

8. Similarly unconvincing is plaintiff's argument that because the defendant has not sup-

ported the affirmative defense available under § 259, any violation should be treated as willful. Defendant Extended Family Concepts has not specifically raised the affirmative defense in its motion. Further, even if it brought forth evidence that failed to show reliance upon an appropriate precedent, it does not follow that it violated the Act deliberately or intentionally.

**458**

barred. Accordingly, the Court grants defendant's motion on this issue.

### IV. CONCLUSION

For the reasons stated herein, the Court denies Defendant Extended Family Concepts' motion for summary judgment on the issues of the companionship exemption and the agreement to exempt sleep time. The Court grants defendant's motion regarding the applicable statute of limitations.

IT IS SO ORDERED